LAND, Justice.
 

 Mrs. Mordest Hattier Martinez, wife of John F. Martinez, Jr., brought the present suit against her husband January 31, 1939, for a separation from bed and board, with alimony, and prays for the permanent custody of their little daughter, Caroline Anne Martinez, who was born on the 17th day of April, 1936.
 

 Plaintiff was married to John F. Martinez, Jr., in the Parish of St. Bernard on the 4th day of July, 1934, and the matrimonial domicile was established in the Parish of Jefferson, where it remained until the
 
 *476
 
 27th day of November, 1937, when plaintiff separated from her husband.
 

 After plaintiff separated from her husband, she filed a suit for separation from bed and board on January 7, 1938, in the' Parish of Jefferson, and on May 10, 1938, judgment was rendered in the suit, dismissing the demand of plaintiff as in case of non-suit.
 

 Thereafter, on the 5th day of June, 1938, plaintiff and her husband became reconciled, and plaintiff went to live with her husband at No. 426 Sixth Street, Gretna, Louisiana.
 

 After this reconciliation, June 5, 1938, plaintiff brought the present suit for separation from bed and board.'
 

 Plaintiff alleges that, on the 15th day of August, 1938, her husband cursed and abused her and that, during the period August 15,
 
 1938,
 
 to August 30, 1938,
 
 he
 
 continued cursing and.abusing her, and finally threatened to kill her with a knife, when she was forced to leave him, which she did on August 30, 1938.
 

 Plaintiff alleges that she remained with her husband, without cohabitation, • until August 30, 1938, on account of their minor child, Caroline Anne Martinez.
 

 Plaintiff further alleges that, in a note written by her husband to her, he threatened harm to her, a copy of the note being annexed to her petition.
 

 The original note referred to is written in pencil on the back of. a photograph of defendant’s wife and is as follows: “Mordest Some Day you will find out that you are a dam fool, you had a good husband, and did not appreciate it, you will know when it is to late, it is not you that I am thinking of, it is My
 
 Honey Darling
 
 Carolyn, and you know that I told you,
 
 that I would get even
 
 so dont never leave it pass your memory, it might take a. long time, but watch my word. I wrote this here so some day you will read it.
 

 (signed) “Love
 

 “Junior.
 

 The italics were made by the writer of the note, the husband of plaintiff.
 

 Plaintiff further alleges that, on January 3, 1939, her husband slapped her in the face, when she went to him to get her baby girl to take her foi an automobile ride.
 

 Plaintiff alleges that, from the time of her and her husband’s reconciliation, June 5, 1938, up to the 30th day of August, 1938, the date of separation, her husband was earning approximately $15 per week, but that he would gamble and bet his money on the races, and that plaintiff at times was forced to obtain money from her parents in order to support herself and baby. That plaintiff has no income for herself and is in necessitous circumstances, and desires that alimony be fixed by the court, in such amount as the court may determine, for the support of herself and-her minor child.
 

 Defendant filed an answer denying the allegations of plaintiff’s petition, and specifically averred that plaintiff left the matrimonial domicile for no cause whatever; that defendant has always been
 
 “a dutiful and home-loving husband”;
 
 and “That your petitioner often has dates with a man known as James LeBlanc, and that he takes
 
 *478
 
 her to shows, night clubs and various other places.”
 

 Defendant did riot make any reconventional demand in his answer, but prayed for judgment denying plaintiff a judgment in her favor, decreeing a separation from bed and board, and for judgment granting to defendant the permanent control, custody and keeping of his child, Caroline Anne Martinez, and for all costs.
 

 The trial judge states in his judgment that, “in view of the fact that the separation was in no way the fault of the defendant,” it is ordered that plaintiff’s suit be dismissed as of non-suit at her costs, and that defendant be granted the care, custody and control of his minor child, Caroline Anne Martinez. From this judgment plaintiff has appealed.
 

 In our opinion, the judgment appealed from is manifestly erroneous.
 

 (1) The testimony of plaintiff clearly establishes the charges of cruelty made by her against her husband during the period August 15, 1938, to August 30, 1938. It was during this period that plaintiff testified that her husband continuously cursed and abused her. It was on August 29, 1938, that she charges defendant with the assault upon her with a knife, and she so testified. And August 30, 1938, when she left her husband, is the date on which he admits that he wrote the note on the back of his wife’s photograph. This note in itself is the best evidence of defendant’s high temper and vindictiveness, and the best corroboration of plaintiff’s testimony. In this parting note, defendant cursed plaintiff, calling her a “dam fool.” In this parting note, defendant said to his wife: “It is
 
 not you
 
 I am thinking of, it is My
 
 Darling Honey
 
 Carolyn,” clearly showing that defendant had lost all his affection for his wife. And in- this parting note, his last words to his wife were: “And you know that I told you,
 
 that I would get even so
 
 dont never leave it pass your memory, it might take a long time, but watch my word.”
 

 The testimony adduced by plaintiff shows that, on August 29, 1938, the plaintiff and her minor child, accompanied by her mother, went for a, ride to the lake and, upon returning, the husband was angered, without rhyme or reason, because they returned later than he expected and, in a fit of passion, attempted to kill her with a knife; that she pleaded with him, and finally was compelled to leave him on the. following day. Notwithstanding the denial by the husband, in his answer and on the witness stand, of the charges brought against him by his wife, the parting note- written by him to his wife is clear and positive proof against him that he was not “a good husband,” as stated by him in this note, and was much farther from being “a dutiful and home-loving husband,” as averred by him in his answer to plaintiff’s demand for a separation from bed and board.
 

 (2) In our opinion, also, the charge made by plaintiff that, on January 3, 1939, her husband slapped her in the face when she went to get her little daughter to take her for a ride, has been established by the evidence in the case.
 

 Plaintiff separated from her husband on August 30, 1938. At the time of the as
 
 *480
 
 sault by defendant on his wife, January 3, 1939, the father was living with his parents and the mother and child with the mother’s parents. The child was already in the care and keeping of the mother, having been with her continuously during the four months she was living with her parents, separate and apart from her husband.
 

 In a habeas corpus proceeding, brought by defendant against plaintiff to obtain custody of the child, judgment was rendered of date February 9, 1939, granting to defendant, the relator, the custody and care of the child. However, on the day fixed for the hearing of the habeas corpus, plaintiff brought the present suit for separation from bed and board, and prayed for and obtained an order from the judge giving her the provisional care and keeping of the child, pending the suit for a separation from bed and board. On application to the Supreme Court for writ of certiorari and alternative writ of prohibition, the judgment granting custody of the child to relator was reversed, and the order dated January 31, 1939, granting to Mrs. Mordest Hattier Martinez the provisional care of the child was reinstated. State ex rel. Martinez v. Hattier, 192 La. 209, 187 So. 551.
 

 The testimony of plaintiff shows the following facts in connection with the charge that defendant slapped her in the face.
 

 Plaintiff and her child were at her mother’s home and were ready to go across the lake to Covington. Defendant came down and asked for the baby, stating that he wanted to show the child to his aunt who was from the country, and that he would bring her back within a half hour. Defendant, however, did not return the child within a half hour, and plaintiff sent a little girl, by the name of Mamie Polizer, for her. When she came back, she did not have the child with her. Plaintiff then sent Mamie Polizer for the child again but she came back without the child. Then, the third time, plaintiff and Mamie Polizer went there and asked defendant for the baby. What happened then is stated by plaintiff as follows: “I said I come for the baby — I said you told me you were only going to keep the baby for half an hour, and you haven’t sent her back. Then he asked me to let the baby stay with him, and I told him I wanted to take the baby with me across the lake to my aunt and uncle’s house. I said if you want the baby tomorrow you can have her all day. So the baby started to cry, and I picked the baby up in my arms to walk down the street, and he walked to the gate with me. So I put the baby down, and he was holding one of the baby’s hands, and I, was holding the other hand, and he said let me keep her today, and I said no, I am going to take her with me. He said what time are you coming back, and I said I don’t know what time it will be, but I don’t think it will be time for you to come and get her — I said if you want her, come tomorrow and get her.
 
 Then he said you don’t have to get so nasty, because I won’t let you take the baby.
 
 Then I picked the baby up and was going to run down the street with her,
 
 and he was holding the baby, and he slapped me in the face,
 
 and I left him standing there and ran down the street and the little girl was .standing on
 
 *482
 
 the corner, and she said did he hit you, and I said yes.” Tr., pp. 29, 30. (Italics, ours.)
 

 The testimony of plaintiff is fully corroborated by that of the little girl, Mamie Polizer, who is thirteen years old, and who testified as follows: “Well, they were going out one day, and Junior came down for the baby, and Mordest said they had to go out, and he said my aunt is over at my house, and,she wants to see the baby, and Mordest said you can take her for fifteen minutes, and he took her, and he didn’t come back in fifteen minutes, and Mordest sent me for the baby, and when I got there Junior said to me what do you want, and I said I want the baby. He said tell Mordest I am not going to send her the baby, and I went back and told her, and she sent me back there again, and I told him that she wanted the baby. He said to me you get to hell away from here before I slap you in the face. I came back and told Mordest, and Mordest went with me, and he told me to go to the corner he wanted to tell her something, and I went to the corner, and I thought he would give her the baby, and I stopped on the way and turned back and seen Junior hit her, and she left the baby go and came running, and she went and told her daddy.
 

 “Q. Did you see him slap her? A. Yes, sir.
 

 “Q. Are you positive about that? A. Yes, sir.
 

 “Q. Where did he slap her? A. In the. face.
 

 “Q. That was on the sidewalk? A. Yes, sir.”
 

 The witness identified the date of the slapping as having occurred on the date charged by plaintiff, January 3, 1939. Tr., pp. 47, 48.
 

 In our opinion, plaintiff has proved by credible witnesses the charges of continuous abuse and cruel treatment by her husband, set forth in her petition, of such a nature as to render their living together insupportable.
 

 (3) Defendant did not file any re-conventional demand and, when he attempt-, ed to introduce evidence to prove the allegations of Article 17 of his answer, that plaintiff often “has dates with a man known as James LeBlanc,” the same was objected to because the allegations are general and did not charge any specific time.
 

 The court erroneously overruled the objection and allowed testimony, to be offered by defendant.
 

 Plaintiff separated from her husband the first time November 27, 1937, and thereafter on June 5, 1938, plaintiff and her husband became reconciled, and lived at No. 426 Sixth Street, Gretna, Louisiana.
 

 Defendant, who had threatened to
 
 “get even with his wife,”
 
 placed one Mervin Weigel on the stand, who had been employed by plaintiff’s father, Walter Hat-, tier, at his place of business, and had, been : discharged by his employer, to prove the . charge made in defendant’s answer, “That your petitioner often.has dates with a man known as James LeBlanc, and .he takes her
 
 *484
 
 to shows, night clubs and various other places.”
 

 When asked if he was in any way related to Mrs. Martinez, plaintiff, Weigel replied that he was her
 
 "first cousin."
 
 Tr., p. US.
 

 The witness testified that, when Mr. and Mrs.. Martinez separated the first time, he very often went out on á double date with Mrs. Martinez and James LeBlanc, Wei-gel’s date being a Miss Juanita Brown of Algiers. That they would go to the lake and go riding around, would drink to excess and become intoxicated, and return home at 12 o’clock, 1 o’clock, or 1:30 in the morning.
 

 (4)Plaintiff separated from her husband the second time on August 30, 1938, and plaintiff and her little daughter went to live with her father, Walter Hattier, and her mother, Mrs. Sophie Hattier, on Huey P. Long Avenue, between Fourth and Fifth Streets in Gretna.
 

 Weigel testified that, after the second separation, he went out with Mrs. Martinez and LeBlanc a few times. That they went out to the lake together, and would stop at stands on the lake front and, when they were parked, Mrs. Martinez and LeBlanc would get out and take a walk for about a half hour, and they would come back and tell me and the girl with me (Miss Juanita Brown) to take a walk, and that he and the girl would take a walk. Tr., p. 118.
 

 The testimony of Weigel as to the intoxication of the parties, and as to their late arrival at home, as well as to any improper conduct upon the part of any of them, is flatly contradicted by Mrs. Martinez, LeBlanc, Miss Brown, Mrs. Sophie Hattier, mother of Mrs. Martinez, and by Mrs. Robert Brown, mother of Miss Juanita Brown.
 

 It is evident that the trial judge did not believe Weigel, who had lived with plaintiff in her father’s and mother’s home a long time, and who was taken into the home when he had no other place to live and was provided with employment.
 

 The trial judge did not believe his testimony because he did not dismiss the suit of plaintiff but rendered a judgment of non-suit.
 

 (5) The most vicious and most unnatural testimony of Wiegel was given in the case when he testified that plaintiff,
 
 his first cousin,
 
 while she was living with her husband at No. 426 Sixth Street, Gretna, requested him to tell LeBlanc to come to the house to meet her at 11 o’clock at night, when plaintiff’s husband had gone to work, and that LeBlanc was there when Weigel returned. Weigel is flatly contradicted by LeBlanc and Mrs. Martinez. Without any contradiction of his testimony, it is inconceivable that plaintiff,
 
 the first cousin,
 
 of Weigel, would deliver such a message to
 
 her own kinsman.
 
 It is indeed a foul bird that will defile its own nest. Tr., p. 116.
 

 (6) In a further but futile effort to place a stigma upon Mrs. Martinez, in order to prove her an unfit person for the custody of her little daughter, Weigel goes through the same cut and dried formula, after the second separation, with Mrs. Martinez and Salvadore Bohemia, as the new date, and
 
 *486
 
 with the witness and Miss Juanita Brown as his date. They attend a wrestling match, go to the lake to drink, one couple gets out of the car and the other remains in the car. Tr., pp. 118, 119, 121.
 

 The entire testimony of this witness is denied by Salvadore Bohemia, Miss Brown, and Mrs. Martinez' as to any improper conduct upon the part of any one of them.
 

 To show the utter lack of value of the testimony of Mervin Weigel, as incriminating evidence, the following questions and answers of the witness, on cross-examination, must be considered:
 

 “Q. What is your girl’s name? A. Juanita Brown.
 

 “Q. She is a nice little girl, isn’t she? A. Yes.
 

 “Q. A perfect little girl? A. Yes.
 

 “Q. And you say you went out on double dates with Mrs. Martinez? A. Yes.
 

 “Q. With her and James LeBlanc? A. Yes.
 

 “Q. You say they would get out of the car and take a walk? A. Yes sir.
 

 “Q. And then you got out and took a walk? A. Yes sir.
 

 “Q. When you stayed in the car with your girl, did anything at all happen? (Question objected to)
 

 “Q. You and your date would stay in the car while they took a walk? ‘A. Yes.
 

 “Q.
 
 What would you all do in the car ? (Objected to) .Objection overruled by the Court A.
 
 We would talk, that was all.
 

 “Q.
 
 And when you got out and took a walk,
 
 you talked?
 
 A.
 
 Yes.”
 
 Tr., pp. 120, 121, 122. (Italics ours.)
 

 “Q. When you say that LeBlanc and Mrs; Martinez would meet at her mother’s house, who would be there ? A. Mrs. Martinez and LeBlanc and Mrs. Hattier and myself.
 

 “Q. Mrs. Hattier would be there, wouldn’t she? A. Yes.
 

 “Q. All the time? A. No, not all the time. Sometimes Mrs. Hattier laid down and slept.” Tr., p. 123.
 

 Mr. Walter Hattier, in describing his home, testified as follows: “It is a double house, but we use it all in one. There is a door between her bedroom and her mother’s bedroom, and in the kitchen, and you can go from one side to the other.” Tr., p. 49.
 

 Mrs. Sophie Hattier denies positively and emphatically that there has been any clandestine meeting at her home between her daughter, plaintiff in this case, and LeBlanc. She testified as follows:
 

 “Q. Did Mr. LeBlanc used to come to your house while they were living together, and Mrs. Martinez was not there? A. Yes, he used to come around to my house. Mr. Martinez was good friends with Mr. LeBlanc.
 

 “The Court:
 

 “Q. Is Mr. LeBlanc a married man? A. No sir.”
 

 “Mr. Langridge, attorney:
 

 “Q. Did all of h>s folks come to your house? A. Yes sir, his sister and brother.
 

 
 *488
 

 “Q.
 
 And you are positive that he did not meet Mordest, your daughter, at your house, while Mr. and Mrs. Martinez were living together? A. I wouldn’t stand for such a thing as that.” Tr., p. 66.
 

 Mrs. Lela Lauricella lives in the neighborhood in which Mr. and Mrs. Hattier reside, and has known them all of her life. She is a frequent visitor ■ at the Hattier home.
 

 When asked, “What would you say as to the surroundings and the conditions under which this little child has been raised, and is being raised, and the kind of home she has?” the witness replied: “A. I think she couldn’t possibly have any better home. I am a mother myself, and I think she is being raised perfectly well and ladylike.
 

 “Q. How old is your child? A. My baby will be seven in August. My baby is always there, and if she didn’t have the right kind of raising I wouldn’t let my baby be there. The baby is well cared for, and has a mother’s love, and she has everything she wants.
 

 “Q. The house is comfortable and clean ? A. Yes, and it is a decent and respectable house. That baby gets her nap, and her medicine, and she has a mother’s love, and that is all I have to say.” Tr., p. 54.
 

 Mr. Albert Gehring lives next to Mr. and Mrs. Hattier’s home, and is a frequent visitor there. As to the circumstances and the surroundings in which this little girl, the daughter of Mrs. Martinez, has been reared, since she has been under the care of Mr. and Mrs. Hattier, this witness testified as follows:
 

 “A. She has got a good home. The mother and Mrs. Hattier both treat her very good.
 

 “Q.
 
 Is the home comfortable? A. Yes sir, it is very comfortable.
 

 “Q. How is the home furnished — is it furnished with all the necessities of life? A. Yes, they have all the necessities there.
 

 “Q. Is is nicely furnished? A. Yes sir, everything is up to the minute.
 

 “Q. Would you say that it is a comfortable home for a child to be raised in? A. I certainly would. It has its own bath and everything it needs, and it gets everything it needs to eat and everything else. She is a very delicate child, and she doesn’t eat everything, and they buy what she wants — no matter what she wants, they get it for her.
 

 “Q. You know that to be a fact? A. Yes.
 

 “Q. You are around there enough to know that? A. Yes.
 

 “Q.
 
 That the child gets the best of care and attention? A. She really does.” Tr., p. 53.
 

 Our conclusion is that plaintiff is entitled to a decree of separation from bed and board, and also to the permanent care and custody of her little daughter, Caroline Anne Martinez. The child is of that tender age at which a child needs a mother’s care more than that of any one
 
 *490
 
 else. The child is in as comfortable and happy an environment in the home of mother and maternal grandparents as the child could be anywhere else.
 

 The evidence does not show the mother to be unworthy of the care and keeping of her child, or disqualified for the responsibility.
 

 The maternal grandfather is well able financially to supply the child’s wants, and he testified that he is very willing to continue supplying them. See testimony of Walter Hattier, Tr., pp. 48, 49 and 50.
 

 (7) When the petition for separation from bed and board was filed in this case, on January 31, 1939, a rule on defendant, John F. Martinez, Jr., was served to show cause on February 16, 1939, at 10:30 o’clock, why he should not pay alimony in an amount to be fixed by the court, for the maintenance and support of his wife and minor child. Tr., p. 5.
 

 On May 11, 1939, a rule was also served on defendant to show cause why he should not pay alimony at the rate of $20 per month, beginning from the date of the institution of this suit, and all costs of this rule. Tr., p. 12.
 

 Neither of these rules,has been tried.
 

 On August 4, 1939, it was ordered, after hearing by rule, that John F. Martinez, Jr., pay the sum of $2.50 a week for the support of his minor child, until judgment has been rendered on the merits in this case. Tr., p. 17.
 

 Judgment on the merits was rendered on December 6, 1939, dismissing plaintiff’s suit for separation from bed and board, and granting the care, custody and control to defendant of his minor child.
 

 A suspensive appeal was taken by plaintiff from this judgment on the main demand on December 7, 1939. On the same day a rule for contempt, dated November 29, 1939, was served on the defendant to show cause why he should not be adjudged guilty of contempt of court for violating the order of the court of date August 4, 1939, condemning defendant to pay alimony at the rate of $2.50 per week, the defendant then being in arrears for fifteen weeks. The contempt proceedings have never been tried.
 

 The trial judge has fixed by rule only provisional alimony until judgment has been rendered on the merits, and no alimony pendente lite has been fixed in the judgment on the main demand from which plaintiff has appealed. Plaintiff has not appealed from the judgment fixing provisional alimony but, on the other hand, is attempting to enforce it in the lower court by contempt proceedings.
 

 As said in Gormley v. Gormley, 161 La. 121, at pages 124, 125, 108 So. 307, at page 308: “Plaintiff complains of the action of the defendant in discontinuing the payment of alimony after the dismissal of her suit. She prays, in her answer to the appeal, that the alimony be increased from $75 to $100 per month, and that defendant be ordered
 
 *492
 
 to pay said alimony as thus increased from Aprií 1, 1925, and pending the result of this litigation. The alimony here was fixed by the court below after a hearing on a rule taken for that purpose. It constitutes no part of the judgment appealed from. The appeal from the main judgment, and the answer thereto, has not brought up to this court the particular order rendered prior thereto on a special rule. A judgment awarding or refusing alimony is in itself appealable. The wife’s claim for alimony in this case, therefore, is not a subject-matter over which the district court had lost jurisdiction by the appeal. State ex rel. Malady v. Judge, 22 La.Ann. 264. See, also, Carroll v. Carroll, 48 La.Ann. [835], at page 842, 19 So. 872.” See, also, Graff v. Fazende, 172 La. 441, 134 So. 387.
 

 The demand for alimony pendente lite is therefore not before us.
 

 For the reasons assigned, it is ordered that the judgment appealed from be annulled and reversed.
 

 It is now ordered that there be judgment herein in favor of plaintiff, Mrs. Mordest Hattier Martinez, and against defendant, John F. Martinez, Jr., decreeing a separation “a mensa et thoro.”
 

 It is further ordered that the permanent care, custody and control of her minor child, Caroline Anne Martinez, be and is hereby granted to plaintiff, Mrs. Mordest Hattier Martinez, and that defendant, John F. Martinez, Jr.,- pay all costs of this suit.